```
 1                    UNITED STATES DISTRICT COURT
 2                    SOUTHERN DISTRICT OF NEW YORK

 3    ------------------------------x
 4    ORBITAL PUBLISHING GROUP INC,

 5              Plaintiff
 6                                  DOCKET NO.: CV-11-3065 (PAC)
 7         -vs-                     New York, New York
 8                                  May 10, 2011
 9    BANK OF AMERICA N.A.,


10              Defendant
11    ------------------------------x

12            TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE

13            BEFORE THE HONORABLE PAUL A. CROTTY
14                  UNITED STATES DISTRICT JUDGE


15    A P P E A R A N C E S:

16    For the Plaintiff:          DAVID P. LENNON, ESQ.
17                                Lennon & Klein P.C.
18                                410 Park Avenue, 15th Floor
19                                New York, NY  10022


20    For the Defendant:          DAVID B. CHENKIN, ESQ.
21                                JANTRA VAN ROY, ESQ.
22                                Zeichner Ellman & Krause LLP
23                                575 Lexington Avenue
24                                New York, NY  10022




25    Audio Operator:             No Audio Operator

26          Proceedings Recorded by Electronic Sound Recording
27            Transcript Produced by Transcription Service
28    -----------------------------------------------------------
29                         KRISTIN M. RUSIN
30                      217 Pine Meadows Circle
31                        Hickory NC 28601
32                      kmrusin@earthlink.net
```

1    THE CLERK:  Your Honor, this is the matter of Orbital

2    Publishing Group Inc v. Bank of America N.A., docket number

3    eleven civil three zero six five.

4        Counsel for plaintiff, please state your appearance.

5        MR. LENNON:  Good morning, Your Honor.  David Lennon,

6    of Lennon & Klein, --

7        THE COURT:  Okay, Mr. Lennon.

8        MR. LENNON:  -- for plaintiff Orbital Publishing

9    Group.

10       THE COURT:  All right.

11       THE CLERK:  For defendant?

12       MR. CHENKIN:  Good morning, Your Honor.  David

13   Chenkin, from Zeichner Ellman & Krause LLP, for Bank of

14   America, and I'm here with my partner Jantra Van Roy of our

15   firm.

16       THE COURT:  Okay.

17       MR. CHENKIN:  Thank you.

18       THE COURT:  Mr. Lennon, have you seen the affidavit

19   declaration of Ms. Virginia Prieto [phonetic]?

20       MR. LENNON:  Yes, Your Honor.  It was handed to me

21   ten minutes ago.

22       THE COURT:  Okay.  What do you have to say?

23       MR. LENNON:  Other than it's -- I mean, it doesn't

24   say any justification for withholding the money.

25       THE COURT:  Right.

1       MR. LENNON:  I mean, that -- I could go through it,

2  Your Honor, and point out all of its deficiencies.

3       THE COURT:  Well, you've had it for ten minutes,

4  which is exactly ten minutes longer than I've had it, so why

5  don't you give me the benefit of your insight?

6       MR. LENNON:  Well, they say two things.  They say

7  they received an undisclosed number of returned checks, and

8  that my client Orbital was depositing checks that were endorsed

9  by Orbital but payable to another -- payable to a magazine.

10  That's completely proper.  We don't dispute that that happens

11  from time to time.

12       Orbital Publishing is an independent magazine

13  subscription company.  They send out thousands of magazine

14  solicitations to their customers for hundreds of different

15  magazines.  Sometimes customers -- even though they're

16  instructed on the mail piece to make the check payable to

17  Orbital or one of its DBAs, sometimes the customer will make

18  the check payable to Time Magazine or the Wall Street Journal

19  or Fortune, or whatever magazine that they're buying.  Under

20  the UCC that's a totally proper endorsement, and those checks

21  were deposited and have been cleared.

22       Now, according to the affidavit, some of those checks

23  have been returned and have been charged back to Orbital's

24  account, and that's happened over the past and we know that.

25  But all those checks have been covered by Orbital.  They don't

1    talk about how much money there is or how many chargebacks

2    there are.  We don't know if it's five or fifty.  But either

3    way, Orbital has always honored its chargeback commitments to

4    Bank of America.

5            So I don't even -- I don't know what -- again, I

6    don't know what we're talking about.  The affidavit states that

7    Orbital has deposited over thirteen million dollars to its Bank

8    of America account but they don't indicate how many chargebacks

9    there have been.

10           They also found some references on the internet that

11   Orbital is not authorized to solicit certain magazines and any

12   solicitations for those magazines should be considered

13   fraudulent.  Those allegations against magazine subscription

14   agents, Your Honor, happen all the time.  I don't know if my

15   client's even soliciting --

16           THE COURT:  Do you want to continue business dealing

17   with Bank of America?

18           MR. LENNON:  No, Your Honor.  We just want our money

19   back.

20           THE COURT:  Okay.

21           Mr. Chenkin?

22           MR. CHENKIN:  Thank you, Your Honor.  I'd like to

23   address two things that Mr. Lennon said.  First of all, in

24   terms of an endorsement being appropriate under the UCC -- if I

25   may, let me just start with a caveat.  I know you saw my

1  partner Steve Ellman yesterday.  We just got involved in this

2  recently.  I don't have all the facts, so I just want to be

3  careful about what I state as being a fact and what I've

4  learned.

5          In terms of the -- I -- as far as I know, the bank is

6  not aware --

7          THE COURT:  No, what I'd like to know --

8          MR. CHENKIN:  Sure.

9          THE COURT:  -- and I know you've been on a short

10 notice here --

11         MR. CHENKIN:  yeah.

12         THE COURT:  -- is in what -- under what color of

13 authority does the bank impose a complete block on this and

14 then not -- and not deal with the banking customer?  It's the

15 bank's -- it's not the bank's money, right?  It's the

16 customer's money.

17         MR. CHENKIN:  Well, yes --

18         THE COURT:  The bank --

19         MR. CHENKIN:  -- and no, Your --

20         THE COURT:  The bank owes the money to the customer

21 subject to certain terms and conditions in the deposit

22 agreement.

23         MR. CHENKIN:  Correct.

24         THE COURT:  We all understand that.

25         MR. CHENKIN:  That's right.

1          THE COURT:  But part of it, at least in my experience

2  -- maybe limited -- is that when the bank does something, it

3  tells its customer.  Here, you've done none of that.

4          MR. CHENKIN:  Yes.  And, Your Honor, one of the

5  things that I am hoping to be able, if Your Honor wishes, to

6  supplement our production with is the appropriate account

7  agreement governing this account.  I believe that pursuant to

8  that account agreement either the bank or the customer can

9  terminate the relationship at any time.  The bank is not

10  required to give a reason to the customer.  And if there's a

11  suspicion of --

12          THE COURT:  Excuse me.  The bank is able to --

13          MR. CHENKIN:  Is not required to give a reason to the

14  customer.

15          THE COURT:  But how can they hold onto the money if

16  they don't give a reason to the customer?

17          MR. CHENKIN:  Part of that agreement also provides --

18  and I will provide it to the Court as soon as I have it.  Part

19  of that agreement also provides that if there is a suspicion of

20  fraudulent or some type of --

21          THE COURT:  Yeah.

22          MR. CHENKIN:  -- similar type of activity that the

23  bank is within its rights to freeze the account for a period of

24  time until it has the time to make a reasonable investigation.

25          THE COURT:  Well, you've froze it now for three

1    weeks.

2            MR. CHENKIN:  I believe it's approximately three

3    weeks.

4            THE COURT:  Well, April 14th right now is --

5            MR. CHENKIN:  Three weeks.

6            THE COURT:  Do we agree it's --

7            MR. CHENKIN:  Granted.

8            THE COURT:  -- more than three weeks?

9            MR. CHENKIN:  Granted.

10           THE COURT:  So I think that unless you give the money

11   back, Mr. Chenkin, by -- I'll give you a couple of days.  I'll

12   give you till Friday the 13th to give the money back and to

13   identify whatever amounts you want to withhold and justify

14   that.  But there's no reason for you to hold onto money in

15   light of what you're saying.  Give it back.

16           I mean, if you want to withhold a portion -- I mean,

17   if Mr. Lennon wants to post a bond or give you a certified

18   check to guarantee that, I'm going to direct that you return

19   the entire amount on deposit.  You know, if there's -- if

20   you've got an exposure here, I'll ask Mr. Lennon to cover that

21   exposure with a security deposit.  But you've got to give the

22   money back.

23           MR. CHENKIN:  Your Honor, we're in agreement with

24   that, and although it's an ominous date, Friday would be

25   acceptable.  If I may just explain what the exposure is in

1 connection with posting this security, --

2         THE COURT:  Yes.

3         MR. CHENKIN:  -- because we don't object to returning

4 the funds as long as there is sufficient security for the

5 exposure.

6         THE COURT:  Yeah.

7         MR. CHENKIN:  In terms of these checks -- and I did

8 read Mr. Lennon's papers.  My -- with all due respect, I think

9 they focused on the wrong thing.  Just because checks had been

10 deposited a time ago -- these accounts have been open since, I

11 believe, last October.  And just because checks were deposited

12 a time ago and a small amount of them, according to the

13 plaintiff, have been returned as bad or insufficient funds,

14 that's not the bank's real exposure here.

15         The bank's exposure here is the chargebacks that are

16 reflected on the account statements that are attached to

17 plaintiff's papers.  So if a person sends a check to plaintiff,

18 and if it turns out that the plaintiff did not have the

19 authority to act on behalf of, say, the Wall Street Journal,

20 and if I thought I was extending my subscription with the Wall

21 Street Journal, and I sent the plaintiff a check, the Wall

22 Street Journal cancels my subscription and says we don't have

23 any relationship with the plaintiff, that's not us, I go back

24 to my bank and I look at that check and I see that it's made

25 payable to the Wall Street Journal but it's not endorsed by the

1  Wall Street Journal, it's endorsed by the plaintiff and it was

2  deposited to the plaintiff's Bank of America account, and I go

3  back to my bank and I make a claim on the drawee bank to say

4  that you should not have paid that check, and it would be

5  correct under the UCC, and the drawee bank has to reimburse the

6  customer, and the drawee bank has a claim against Bank of

7  America because Bank of America was the depositary bank --

8          THE COURT:  How many times has that happened in the

9  last eight months?

10          MR. CHENKIN:  I cannot swear to it, but I spoke with

11  someone this morning who said that the number of checks that

12  have been returned so far under that scenario is approximately

13  six hundred, which is a lot of checks.  The dollar amount,

14  because each one of these checks apparently is for a magazine

15  subscription -- you know, which are not thousands and thousands

16  of dollars.  The dollar amount -- I'm getting -- and I could

17  supplement the papers, but there's no question that the dollar

18  amount is small compared to the thirteen million dollars that

19  had gone through the account since October.

20          But that's really the concern, Judge, because the

21  concern is people aren't finding out about the fact that their

22  subscriptions really aren't being extended for a long period of

23  time, because often you would extend your subscription a couple

24  of months before it expires, and then you find out three months

25  later that you're not getting your Wall Street Journal, and you

1  do some investigation, and you see that you have a check that

2  you wrote in last November, that's not good, and you make a

3  claim against your bank --

4          THE COURT:  Could you tell me one thing, Mr. Chenkin?

5  With all due respect to your argument, --

6          MR. CHENKIN:  Yes.

7          THE COURT:  -- why don't you tell that to Orbital?

8  Not you.

9          MR. CHENKIN:  I understand that.

10         THE COURT:  Not you.  You just got involved.  But why

11 doesn't your bank that you so ably represent tell that to the

12 customer?

13         MR. CHENKIN:  Judge, with all due respect, the bank

14 is at the very beginning stages of what they believe is a

15 potentially serious fraud investigation.  It is customary for

16 the bank to not have that type of conversation with anybody,

17 number one.

18         Number two, --

19         THE COURT:  They withhold their funds for three

20 months -- or, excuse me, three weeks and don't give them any

21 explanation at all?

22         MR. CHENKIN:  Well, --

23         THE COURT:  Won't even answer their phone call?

24         MR. CHENKIN:  Number two, Your Honor, I believe --

25 and again, Mr. Lennon was there.  I wasn't.  I grant him that.

1  I believe there was an issue with the authority of counsel to

2  discuss the bank account with the bank.  The bank has --

3          THE COURT:  Oh, please.

4          MR. CHENKIN:  I know you're laughing, but listen.

5          THE COURT:  Please.  You know, the bank is now asking

6  for Mr. Lennon's bona fides?

7          MR. CHENKIN:  No, no, no, no.  If I may for one

8  second, Your Honor, --

9          THE COURT:  Yeah.

10         MR. CHENKIN:  -- part of the fraud investigation is

11 the following.  There were two authorized signers on the

12 account.  One was an officer of the company and one was one of

13 the bookkeepers who signed one of the declarations here.  The

14 bank had found out, I believe very recently, that the officer

15 of the company passed away in February.  So the only authorized

16 signer on the account, the only person authorized --

17         THE COURT:  Is the bookkeeper.

18         MR. CHENKIN:  -- to speak with the bank, is the

19 bookkeeper.  And I believe that there was an issue with

20 obtaining authority from the bookkeeper for the bank to discuss

21 the accounts with someone outside of the company, which is the

22 counsel.  I wasn't there.  I'm not making an excuse.  All I'm

23 saying is that I believe that there may be issues there that

24 aren't simply a stonewall by the bank.

25         THE COURT:  Okay.

1    MR. CHENKIN:  And to bring it back to just the last

2  point that I wanted to make, if I may, Your Honor, the claims

3  that can be made by the drawers of the checks against Bank of

4  America -- that has a very long tail.  Those claims in New York

5  State could be made for six years under the UCC and, under the

6  UCC that's adopted by the enlightened rest of the country,

7  usually three years.

8    So there could be a situation where the bank -- I'm

9  not saying all thirteen million, but there is a potential for

10  those checks -- particularly given the internet research that

11  the bank had done and the -- and the fraud concern, there is a

12  potential that we could have a tail here whereby checks that

13  get charged back to Bank of America that Bank of America has

14  already given credit to the plaintiffs for could far exceed the

15  four hundred thousand dollars that remains in the account right

16  now, which is one of the reasons that we respectfully request

17  that if the -- if the Court is going to issue a TRO, require

18  the bank to return the funds, that the bank has equal security

19  in the amount of the funds that are currently on deposit,

20  because I fear that I may be standing here six months from now

21  saying Judge, we're now up to over a million dollars in

22  chargebacks, and we don't know where it's going to end.

23    We just don't know.  It's too soon in the process.

24  And plaintiff would ultimately be liable to the bank for every

25  dollar of checks that are charged back.  And being a UCC

1  lawyer, my real concern is if they have a check that's payable

2  to Redbook or the Wall Street Journal, and they don't have an

3  endorsement from that entity, and they're just stamping their

4  name on the back and depositing it, and they have no agreement

5  with that entity to endorse in their name or endorse without

6  their name, Bank of America is going to be stuck for every one

7  of those checks.  Thank you.

8       THE COURT:  And in the -- you can't tell me of the

9  thirteen --

10       MR. CHENKIN:  Approximately thirteen million in

11  credits from --

12       THE COURT:  -- thirteen million two hundred and

13  ninety-five thousand dollars which has transited this account

14  from October through April --

15       MR. CHENKIN:  Right.

16       THE COURT:  -- October of 2010 through April of --

17       MR. CHENKIN:  Correct.

18       THE COURT:  -- April 14th of 2011 --

19       MR. CHENKIN:  Yes.

20       THE COURT:  -- some thirteen million dollars, you've

21  had six hundred claims?

22       MR. CHENKIN:  Six -- approximately six hundred checks

23  that have come back so far, and the amount is a small amount.

24       THE COURT:  So far for insufficient funds, or for --

25       MR. CHENKIN:  No, I --

1    THE COURT:  -- for claims --

2    MR. CHENKIN:  I believe that they -- I believe that

3  all or most of them -- and I could confirm it; it's just I've

4  been in this for a couple of hours -- were returned because the

5  endorsement of plaintiff on the check was not the payee that

6  the check was made payable to.

7    THE COURT:  Okay.

8    MR. CHENKIN:  So it's as if there was a check payable

9  to you, Your Honor, and I took it, somehow I got it from you,

10  and I put my own endorsement on it, David Chenkin, and I

11  deposited it to my account.  There is no endorsement from you.

12  I don't have any authority from my bank that says that the name

13  David Chenkin is -- suffices for the name of Judge Crotty, and

14  I put it in my account.

15    I can tell you that the drawer of that check can go

16  back to his or her bank and be reimbursed for the amount of

17  that check if it turns out that it really was without

18  authority, and that's the real concern here.  And the real

19  concern is --

20    THE COURT:  And do you --

21    MR. CHENKIN:  -- that there's a lot of those.

22    THE COURT:  Do you know, Mr. Chenkin -- and maybe you

23  don't know, so if you don't, you'll tell me that -- what the

24  average amount is of the checks that are in this group of six

25  hundred?  Is it fifty dollars?  Is it a hundred dollars?

1          MR. CHENKIN:  Judge, I honestly don't know.  I spoke

2  to someone -- you could see the affidavit of some fraud

3  investigator in California.  She was in her office at five

4  thirty this morning.  Those are her regular hours, by the way.

5  But in order to get the information for this stuff, Ms. Van Roy

6  and I have been working on this largely through the night, and

7  -- but I just don't know the average dollar amount.

8          I can tell you, Your Honor, that although I don't

9  have it for sure, I believe that the total amount of the

10  chargebacks, if you look at the accounts, today are probably

11  less than fifty thousand dollars.  But the point is that it

12  takes a long time -- this account's only open since last

13  October.

14          It takes a long time for David Chenkin, whose

15  magazine -- subscribing in three months, who sends the check

16  in, to finally figure out at the back end that I got hoodwinked

17  and I'm not getting my subscription, to go back to my bank.  I

18  would have -- in New York I could have six years to go back to

19  the bank on a forged endorsement.

20          THE COURT:  Okay.

21          Mr. Lennon?

22          MR. LENNON:  One point of law I need to, I think,

23  correct Mr. Chenkin on.  Six years for a check is for

24  conversion.  That's not the claim here.  The claim here is for

25  an improperly endorsed check made payable to a particular

1  payee.

2          There's no allegation that the clients or the

3  customers of Orbital that sent the checks to Orbital had a

4  solicitation that said buy this magazine from us, pay the check

5  to us, and we'll get you the magazine.  And that's what

6  happened.

7          THE COURT:  Listen --

8          MR. LENNON:  The six hundred that he's talking about

9  are people that wrote checks payable to the Wall Street Journal

10  and sent back the solicitation remittance to Orbital.  That's

11  not a -- that's not a forged endorsement.

12          THE COURT:  You don't want to do business with Mr.

13  Chenkin's client.

14          MR. LENNON:  Well, --

15          THE COURT:  Mr. Chenkin's client doesn't want to do

16  business with you.  So I'm going to direct the return of the

17  money.  It's only subject to a sufficient amount of security.

18  Now, my recollection in your TRO papers, which I did not sign,

19  Mr. Lennon, because you hadn't given notice to your attorney --

20  the attorneys on the other side, which you have to do, but --

21  Marlon, do you have the order to show cause?  Do you have the

22  order --

23          MR. LENNON:  Your Honor, for the record, --

24          THE COURT:  Yeah.

25          MR. LENNON:  -- I gave notice to the bank.  They

1  didn't have counsel --

2           THE COURT:  Yeah, I understand.

3           MR. LENNON:  -- and they wouldn't tell me who their

4  lawyer was.

5           THE COURT:  Yeah, I understand.

6           MR. LENNON:  And as for this --

7           THE COURT:  Just bear with me.  Okay, you're willing

8  to post a bond.  How much is the bond you're willing to post?

9           MR. LENNON:  Your Honor, it should be a de minimis

10  amount.  I mean, even --

11           THE COURT:  Okay.

12           MR. LENNON:  -- ten thousand dollars.

13           THE COURT:  No.  It should be about ten percent of

14  the -- ten percent of the amount that you're seeking returned.

15  That's four hundred thousand dollars.  You post a bond of forty

16  thousand dollars, and I'll direct that Bank of America return

17  the -- return the funds by Friday the 13th.

18           MR. LENNON:  Thank you, Your Honor.

19           MR. CHENKIN:  Your Honor, maybe I --

20           THE COURT:  Mr. Chenkin?

21           MR. CHENKIN:  May I be heard on that for a moment?

22           THE COURT:  Yes.

23           MR. CHENKIN:  With all due respect, if that's the

24  amount that Your Honor is requesting, --

25           THE COURT:  It's ten percent.

1          MR. CHENKIN:  That's fine.

2          THE COURT:  That ought to be adequate in light of
3    what happened.

4          MR. CHENKIN:  The -- my concern, though, Judge, is
5    that the returns that are potentially going to come back are
6    going to dwarf that amount.  And if the bank --

7          THE COURT:  I know that's your concern.  But if your
8    concern is that -- if that's the -- and I know it's not your
9    concern but it's the bank's concern.

10          MR. CHENKIN:  Yes.

11          THE COURT:  You're representing your client.  But the
12    client has an obligation here as well, and it should have told
13    Orbital a long time ago.  I mean, it just can't stick its head
14    in the sand.  You know, Mr. Lennon's papers are convincing in
15    terms of the bank's ignoring any kind of disclosure obligation.
16    I thought maybe the government was trying to seize these
17    materials, the bank -- the proceeds.  But it's not.  It's just
18    the bank who's conducting its own investigation.  They don't
19    give an explanation.  I've never heard of that.

20          MR. CHENKIN:  With all due respect, Your Honor, it --
21    the account agreement, the contractual agreement, from --
22    between the parties allows the bank to do that.

23          THE COURT:  Okay.  Well, I'm going to enter my order,
24    Mr. Chenkin, and Mr. Lennon will prepare the order, serve it on
25    you.  Make sure you have no objection, and -- other than the

1   ones you've already voiced, --

2          MR. LENNON:  Your Honor, --

3          THE COURT:  -- and it's to preserve, and I'm going to

4   direct you by Friday the 13th, the close of business on the

5   13th, to return the amount on deposit now in -- from Orbital

6   that's now on deposit with Bank of America, and subject to

7   Orbital Publishing posting a bond in the amount of forty

8   thousand dollars, such bond being against the costs and

9   exposure that you may have because of the reasons that you

10  cite.

11         Yes, Mr. Lennon?

12         MR. LENNON:  Your Honor, as an alternative, so that

13  we don't have to go to the expense of posting the bond, if Bank

14  of America would take forty thousand dollars of the proceeds

15  and they could pay that to the clerk of the court, would that

16  satisfy the security requirement?  It would be the same thing.

17         THE COURT:  Mr. Chenkin?

18         MR. CHENKIN:  I don't think I have a problem with

19  that.

20      (Off the record discussion)

21         MR. CHENKIN:  That would be acceptable, Your Honor,

22  if we could arrange for an order to have the bank pay it into

23  the court.

24         THE COURT:  Well, you negotiate that with Mr. Lennon,

25  and --

1    MR. CHENKIN:  That's --

2    THE COURT:  -- you submit the order on notice.

3    MR. CHENKIN:  That's correct.  And in connection with

4  my negotiation with Mr. Lennon, I want to bring up one last

5  point, please.  The account, although it's closed, is still

6  getting returns daily.  And the procedure that the bank goes

7  through is it honors those returns and reduces the amount in

8  the account, as is banking practice.

9    THE COURT:  Any pending items that you have you

10  should process in the normal course --

11    MR. CHENKIN:  Process, and --

12    THE COURT:  -- in the normal course of business.

13    MR. CHENKIN:  Up until the day that we return the

14  funds.

15    THE COURT:  Till the close of business on Friday.

16    MR. CHENKIN:  Close of business.  That's what I

17  wanted to make clear.

18    THE COURT:  Yeah.  Yes.

19    MR. CHENKIN:  Thank you very much.

20    THE COURT:  Process anything that you have.  And

21  you're free to do that.  And then you'll do a true-up with Mr.

22  Lennon as of the close of business on Friday.

23    MR. CHENKIN:  Very good.

24    THE COURT:  Okay.

25    MR. CHENKIN:  Thank you, Your Honor.

1          THE COURT:  Anything else?

2          MR. LENNON:  Thank you, Your Honor.

3          THE COURT:  Thanks very much.

4                    *     *     *     *     *